[No. D045487. Fourth Dist., Div. One. Dec. 29, 2005.]

SEAN M. SMITH et al., Plaintiffs and Appellants, v.
WELLS FARGO BANK, N.A., et al., Defendants and Respondents.

COUNSEL

Finkelstein & Krinsk, Howard D. Finkelstein, Mark L. Knutson and C. Michael Plavi II for Plaintiffs and Appellants.

Pillsbury Winthrop Shaw Pittman, Daniel G. Lamb, Jr. and Brian D. Martin for Defendants and Respondents.

OPINION

McDONALD, J.—Plaintiff Sean M. Smith, individually and on behalf of a class similarly situated, appeals a judgment following an order granting the motions for summary adjudication and a no-merit determination filed by defendants Wells Fargo Bank, N.A., and Wells Fargo & Company (together Bank) in his action alleging causes of action for unfair business practices (Bus. & Prof. Code, § 17200 et seq.) (UCL),[1] false and misleading advertising (§§ 17200 et seq., 17500 et seq.), and violation of the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.) (CLRA). On appeal, Smith contends: (1) the trial court erred by concluding federal regulations preempt his state causes of action; (2) because violations of federal regulations and breaches of contract may constitute predicate acts for his causes of action and there are triable issues of material fact regarding those predicate acts, the trial court erred by granting Bank's motions for summary adjudication and a no-merit determination; and (3) the trial court abused its discretion by excluding part of his expert witness's declaration.

FACTUAL AND PROCEDURAL BACKGROUND

Bank customers can make merchant or point-of-sale (POS) transactions with their checking accounts using paper checks, automated teller machine cards (ATM Cards), or ATM and check cards (Check Cards). In August 1997, Smith opened a personal checking account with Bank and received a Check Card related to that account. At that time, Smith received Bank's consumer disclosure statement, which stated: "You agree that the accounts you open and our practices are subject to the terms of the **Wells Fargo Consumer Disclosure Statement** regarding the accounts and our policies. All relationships between us are governed by applicable federal law and regulation and California law (except when otherwise required by applicable law), and are

---

[1] All statutory references are to the Business and Professions Code unless otherwise specified. Although the Legislature has not imposed a title or name for section 17200 et seq., the California Supreme Court has referred to sections 17200 through 17209 as the unfair competition law or UCL. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, fn. 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

subject to our policies and the rules described in this disclosure. [¶] You agree to pay all fees and follow all practices described in the **Consumer Disclosure Statement** . . . . [¶] . . . [¶]

"You agree to abide by all future changes to the terms and fees for your accounts. . . . *We agree to notify the first signer of the account in advance of any such fee changes.*" (Italics added.)

*Before May 2002*, it was Bank's practice to deny a POS transaction using either an *ATM Card* or a *Check Card* if, at that time, there were insufficient funds in the customer's account to cover the transaction.[2] In contrast, if the customer used a *paper check* for which there were insufficient funds to cover the POS transaction, Bank would take one of three actions: (1) pay the paper check under any existing overdraft protection agreement with customer; (2) pay the paper check and create an overdraft on the customer's account (and charge the customer an overdraft fee); or (3) return the paper check unpaid for insufficient funds (and charge the customer a fee for the returned check).

In late 2001, as part of Bank's "balance sheet engineering" program to increase revenues, Bank decided to extend its "shadow line" overdraft feature for paper checks to also cover all Check Card POS transactions, thereby potentially increasing Bank's annual revenues between $120 million and $145 million based on additional overdraft fees charged to customers' accounts.

On March 19, 2002, Smith's monthly account statement from Bank included the following notice (Notice): "**IMPORTANT ACCOUNT IN-FORMATION: TO APPROVE AS MANY OF YOUR POINT-OF-SALE (POS) TRANSACTIONS AS POSSIBLE, WELLS FARGO IS CHANGING OUR APPROVAL CRITERIA. IF YOU PERFORM A POS TRANSACTION AND DO NOT HAVE SUFFICIENT FUNDS IN YOUR ACCOUNT TO COVER THE TRANSACTION, WELLS FARGO MAY COVER THE ITEM IF YOU HAVE OVERDRAFT PROTECTION, PAY THE ITEM AND CREATE AN OVERDRAFT TO YOUR ACCOUNT, OR DECLINE THE TRANSACTION. IF WE AUTHORIZE THE TRANSACTION, YOU MAY BE ASSESSED A FEE, WHICH WILL VARY DEPENDING UPON THE ACTION TAKEN. OVERDRAFT PROTECTION IS AVAILABLE TO HELP YOU AVOID THE INCONVENIENCE AND EXPENSE OF OVERDRAFTS AND RETURNED ITEMS. WE ENCOURAGE YOU TO CONTACT YOUR**

---

[2] If the customer had an overdraft protection agreement with Bank, Bank apparently would deny a POS transaction if, at that time, there were insufficient funds in the customer's account or overdraft protection source to cover the transaction.

LOCAL BANKER, CALL OUR PHONE BANK OR VISIT US ONLINE TO SIGN UP FOR OVERDRAFT PROTECTION OPTIONS."[3]

In May Bank implemented the change in its practice described in the Notice.

In December Smith filed the instant complaint. The complaint alleged that Bank's account holder agreement and other materials "failed to adequately disclose that [Bank] unilaterally provide[s] account holders with involuntary overdraft protection in the event the account holder[s] [exceed] their checking account balance through the use of the [C]heck [C]ard for which they are . charged a fee of approximately $30 per transaction. [¶] . . . This practice is in direct contravention to the marketing materials used by [Bank] which represent that overdraft protection is not involuntarily imposed by [Bank] on customer checking accounts. Under no circumstances will [Bank] permit [C]heck [C]ard holders to [cancel] this overdraft protection though the amount of the per transaction fee was never requested, agreed to, or disclosed to the checking account holder[s] when they were provided the [C]heck [C]ard." The complaint's first cause of action for false and misleading advertising alleged that: "24. [Bank's] use of various forms of media to market, advertise, call attention to or give publicity to the terms and conditions of its financial services, including their checking accounts and [C]heck [C]ard program, deceptively misrepresented certain of its attributes and characteristics including, but not limited to, its use as a credit card-type account without extending credit and yet more convenient tha[n] using checks when, in fact, [Bank's] practices materially differed from that advertised by imposing 'overdraft protection' with an overdraft fee per transaction unlike either a credit card or check, constitutes unfair competition and unfair, deceptive, untrue or misleading advertising within the meaning of . . . § 17500, *et seq.*"

The complaint's second cause of action for violation of the UCL alleged that:

"30. . . . [Bank has] violated . . . § 17500, et seq. and . . . numerous state case precedents, statutes, regulations and industry standards, which require [Bank] not sell or offer to provide financial services and products through deceptive or misleading advertisements and other marketing materials, including brochures.

"31. As detailed in the preceding paragraphs, the misrepresentations and nondisclosures by [Bank] of the material facts detailed above, including the

---

[3] Bank customers received the Notice in their monthly account statements, by direct mail, or by addendum to their customer account agreements.

fact that the unilaterally imposed 'overdraft protection' on their checking account holders in connection with their [C]heck [C]ard program (and thus subjecting such persons to improper account charges), at the time these financial services were being advertised, constitutes an unfair business act or practice within the meaning of [the UCL] because [Bank] knew or should have known that the services were represented in a false and deceptive manner and contrary to [Bank's] actual practices. . . .

"32. [Bank's] statutory violations and misrepresentations alleged herein were misleading and had a tendency to deceive the consuming public because they materially misrepresented the terms and conditions of [its] [C]heck [C]ard program."

The complaint's third cause of action for violation of the CLRA was based on the factual allegations previously described in the complaint.

The trial court granted Smith's motion for class certification of his action against Bank, defining the class as " 'All persons and entities who, while a California resident, have been charged an overdraft fee as a result of using a [Bank] Check Card issued by [Bank] . . . .' "

In June 2004 Bank filed motions for summary adjudication of Smith's UCL and false and misleading advertising claims and for a no-merit determination on Smith's CLRA claim. Bank argued: (1) Smith's claims regarding the inadequacy of its disclosure of its May 2002 policy change were preempted by the National Banking Act (NBA) (12 U.S.C. § 24) and regulations issued by the Office of the Comptroller of the Currency (OCC); (2) Bank's disclosure was adequate as a matter of law; and (3) Smith's false and misleading advertising claim has no merit as a matter of law. In support of its motions, Bank submitted a separate statement of undisputed facts.

Smith opposed Bank's motions, arguing his claims were not preempted by the NBA or OCC regulations. He further argued there were triable issues of material fact whether Bank's account agreements and materials were misleading and deceptive because they did not adequately disclose the existence and terms of its Check Card involuntary overdraft policy and its resultant charges and fees, including its May 2002 policy change. In support of his opposition, Smith submitted a separate statement of undisputed and disputed facts. That separate statement asserted that: "*The [N]otice does not explain the policy change in a clear and conspicuous manner and does not make any reference to [Bank's] Check Card and does not identify when the policy change takes effect.* . . . Nor does the [N]otice explain under what circumstances [Bank] will approve or deny a POS transaction when there are insufficient funds in the account." (Italics added.)

In reply to Smith's opposition, Bank, for the first time, cited certain OCC regulations that require disclosures regarding account terms and conditions and require notice of changes in those terms and conditions (e.g., 12 C.F.R. §§ 230.4, 230.5 (2005)).

On September 9, 2004, the trial court issued a tentative ruling granting Bank's motions. At oral argument on that tentative ruling, Smith (apparently for the first time) posited new legal theories for the predicate acts underlying his UCL, CLRA, and false and misleading advertising claims. He argued Bank's alleged breaches of its account agreement and violations of OCC regulations regarding disclosure were predicate acts for those claims.

On September 20, the trial court issued an order confirming its tentative ruling, stating:

"The first issue in this case is whether [Smith's] claims regarding disclosure are preempted. The motion is granted with respect to this issue for the reasons stated below.

"[Smith's] UCL and CLRA claims are predicated on a failure to disclose theory. It is undisputed that [Bank] is a nationally chartered bank. . . . Therefore, it is subject to the [NBA] and the regulations of the [OCC]. The OCC is the federal agency responsible for interpreting the NBA and delineating the scope of acceptable national bank functions. [Citations.] Federal and state courts defer to the regulations of the OCC regarding the preemption of state laws that affect banking. [Citations.]

"A state's laws may be preempted by federal law in three ways [citation]: by express terms [citation], by inference [citation], or by implication when state law actually conflicts with federal law and compliance with both is impossible [citation].

"In August 2003, the OCC proposed to amend its regulation to add provisions clarifying the applicability of state law to national banks. . . . On January 13, 2004, the OCC issued a Final Rule regarding bank activities and operations, and the regulations took effect on February 12, 2004. . . . The Final Rule included 12 C.F.R. § 7.4007, which states in relevant part that '[a] national bank may exercise its deposit-taking powers without regard to state law limitations concerning: . . . disclosure requirements. . . .' Furthermore, 16 F.R. 1904 states that the regulation is a clarification of existing law. . . . Therefore, this situation is not subject to the general rule that statutes are not to be given retroactive effect because the true meaning of the statute has always been the same. [Citation.]

"The second issue is whether [Bank's] advertising was false or misleading. The motion is granted with respect to this issue for the reasons stated below.

"To state a claim under . . . §§ 17200 and 17500, one need only show that members of the public are likely to be deceived. [Citations.] Claims for false or misleading advertising and unfair business practices are evaluated from the reasonable consumer standard. [Citation.]

"[Smith's] false and/or misleading advertising claim is also based upon a failure to disclose theory. [Smith] provides his account statement as evidence that [Bank] engaged in false and/or misleading advertising under the UCL. [Smith] also argue[s] that [Bank's] advertisements are misleading because they do not disclose their overdraft policies regarding [C]heck [C]ards. Because the issue of disclosure is preempted for the reasons stated above, [Smith's] false and/or misleading advertising claim also fails.

"In addition, the Court notes that [Smith] failed to provide any advertising that contained any affirmative misrepresentations and so [Smith's] claim of false and/or misleading advertising fails on this basis."[4]

On September 29, the court entered a judgment dismissing with prejudice all claims of Smith and those class action members who had not timely opted out of the action.

Smith timely filed a notice of appeal.

DISCUSSION

I

*Summary Adjudication Standard of Review*

A trial court's order granting a motion for summary adjudication is reviewed de novo. (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 385 [62 Cal.Rptr.2d 803].) In reviewing that order, we apply the same standards we apply in reviewing a trial court's order granting a motion for summary judgment. (Code Civ. Proc., § 437c, subds. (c) & (f); *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972 [103 Cal.Rptr.2d 672, 16 P.3d 94]; *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1506–1507 [82 Cal.Rptr.2d 368]; *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450 [75 Cal.Rptr.2d 54].) "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed

---

[4] In that order the trial court also sustained Bank's evidentiary objection to paragraph 9 of the declaration of Smith's expert, David W. Stewart, "on the bases of lack of foundation and improper expert opinion."

in all procedural respects as a motion for summary judgment." (Code Civ. Proc., § 437c, subd. (f)(2).) "A party may move for summary adjudication as to one or more causes of action within an action . . . if that party contends that the cause of action has no merit . . . . A motion for summary adjudication shall be granted only if it completely disposes of a cause of action . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).)

"On appeal after a motion for summary judgment [or summary adjudication] has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "The purpose of the law of summary judgment [and summary adjudication] is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).)

*Aguilar* clarified the standards that apply to summary judgment motions under Code of Civil Procedure section 437c. (*Aguilar, supra*, 25 Cal.4th at pp. 843–857.) Generally, if all the papers submitted by the parties show there is no triable issue of material fact and the "moving party is entitled to a judgment as a matter of law" (Code Civ. Proc., § 437c, subd. (c)), the court must grant the motion for summary judgment. (*Aguilar*, at p. 843.) Code of Civil Procedure section 437c, subdivision (o) provides a cause of action has no merit if: (1) one or more elements of that cause of action cannot separately be established; or (2) a defendant establishes an affirmative defense to that cause of action. Code of Civil Procedure section 437c, subdivision (p)(2) states: "A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

*Aguilar* made the following observations:

"First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable

issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . .

"Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. . . .

"Third, and generally, how the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial. . . . [I]f a defendant moves for summary judgment against . . . a plaintiff [who would bear the burden of proof by a preponderance of the evidence at trial], [the defendant] must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Aguilar, supra*, 25 Cal.4th at pp. 850–851, fns. and citation omitted.)

Summary judgment law in California no longer requires a defendant to *conclusively* negate an element of a cause of action. (*Aguilar, supra*, 25 Cal.4th at p. 853.) It is sufficient for a defendant "to show that the plaintiff cannot establish at least one element of the cause of action" (*ibid.*), which the defendant can do "by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence[.]" (*Id.* at p. 854.) However, "[s]ummary judgment law in this state . . . continues to require a defendant moving for summary judgment to present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Ibid.*, fn. omitted.) *Aguilar* stated: "To speak broadly, all of the foregoing discussion of summary judgment law in this state, like that of its federal counterpart, may be reduced to, and justified by, a single proposition: *If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment.* In such a case, . . . the 'court should grant' the motion 'and avoid a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device. [Citations.]" (*Id.* at p. 855, italics added.)

In deciding whether a defendant is entitled to summary judgment or summary adjudication, the court "must . . . determine what any evidence [submitted by the plaintiff] or inference [therefrom] *could show or imply to a reasonable trier of fact.*" (*Aguilar, supra,* 25 Cal.4th at p. 856.) Therefore, if any evidence or inference therefrom shows or implies the existence of the required element(s) of a cause of action, the court must deny a defendant's motion for summary judgment or summary adjudication because a reasonable trier of fact could find for the plaintiff. (*Id.* at pp. 856–857.) "But if the court determines that all of the evidence presented by the plaintiff, and all of the inferences therefrom, show and imply [the existence of a required element of a cause of action] *only as likely as* [its nonexistence] *or even less likely,* it must then grant the defendant['s] motion for summary judgment [or summary adjudication], even apart from any evidence presented by the [defendant] or any inferences drawn therefrom, because a reasonable trier of fact could not find for the plaintiff." (*Id.* at p. 857, fn. omitted.) When relying on inference rather than evidence, a plaintiff "must all the same rely on an inference implying [the existence of a required element] *more likely than* [its nonexistence], either in itself or together with other inferences or evidence." (*Ibid.*) An "inference is reasonable if, and only if, it implies [existence of the element is] *more likely than* [its nonexistence]." (*Ibid.*)

"On appeal, we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] 'The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. [Citation.] Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' [Citations.]" (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202 [119 Cal.Rptr.2d 160].)

Although a CLRA cause of action cannot be summarily disposed of by means of a motion for summary adjudication or summary judgment (Civ. Code, § 1781, subd. (c)), it can be dismissed before trial on a motion for a determination that it is without merit (i.e., a no-merit determination). (Civ. Code, § 1781, subd. (c)(3); *Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608, 624 [55 Cal.Rptr.2d 818].) In practice, courts nevertheless have applied the standards applicable to motions for summary judgment and summary adjudication in deciding motions for no-merit determinations. (See, e.g., *Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 589, 597 [200 Cal.Rptr. 38]; *Consumer Advocates v. Echostar Satellite Corp.* (2003) 113 Cal.App.4th 1351, 1359–1362 [8 Cal.Rptr.3d 22].) One court commented that

it could "see no meaningful distinction in the choice" between dismissal of a cause of action after a motion for summary judgment and a motion for a no-merit determination. (*Consumer Advocates*, at p. 1359.)

## II

### *Federal Preemption of Smith's Causes of Action*

Smith contends the trial court erred by concluding OCC regulations preempt his causes of action.

### A

■ In determining whether a federal statute or regulation preempts a state law, we begin with the general presumption that under the supremacy clause of the United States Constitution a federal statute or regulation does not preempt a state's historic police powers unless preemption is a clear and manifest purpose of the United States Congress. (U.S. Const., art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608]; *Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [91 L.Ed. 1447, 67 S.Ct. 1146]; *Gibson v. World Savings & Loan Assn.* (2002) 103 Cal.App.4th 1291, 1300 [128 Cal.Rptr.2d 19].) As *Gibson* noted: "The states' historic police powers include the regulation of consumer protection in general and of the banking and insurance industries in particular. [Citations.]" (*Gibson*, at p. 1300.) However, the presumption against preemption is "not triggered when the State regulates in an area where there has been a history of significant federal presence." (*U.S. v. Locke* (2000) 529 U.S. 89, 108 [146 L.Ed.2d 69, 120 S.Ct. 1135].)[5] Nevertheless, because preemption of state laws by federal law or regulation generally is not favored, the party claiming federal preemption (e.g., Bank in this case) has the burden to show specific state law claims are preempted.[6] (*U.S. v. Locke, supra*, 529 U.S. at p. 108; *Washington Mutual Bank v. Superior Court, supra*, 95 Cal.App.4th at p. 613; *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 937 [216 Cal.Rptr.

---

[5] One court concluded the field of banking is one area in which there has been a history of significant federal presence, thereby making the general presumption against federal preemption inapplicable. (*Bank of America v. City & County of San Francisco* (9th Cir. 2002) 309 F.3d 551, 558–559.)

[6] "Federal regulations may preempt state law just as fully as federal statutes. [Citation.] An agency may preempt state law through regulations that are within the scope of its statutory authority and that are not arbitrary. [Citation.]" (*Washington Mutual Bank v. Superior Court* (2002) 95 Cal.App.4th 606, 612 [115 Cal.Rptr.2d 765]; see also *Louisiana Public Service Comm'n v. FCC* (1986) 476 U.S. 355, 369 [90 L.Ed.2d 369, 106 S.Ct. 1890]; *Gibson v. World Savings & Loan Assn., supra*, 103 Cal.App.4th at p. 1297.)

345, 702 P.2d 503]; *Monarch v. Southern Pacific Transportation Co.* (1999) 70 Cal.App.4th 1197, 1204 [83 Cal.Rptr.2d 247]; *People ex rel. Sepulveda v. Highland Fed. Savings & Loan* (1993) 14 Cal.App.4th 1692, 1708 [19 Cal.Rptr.2d 555].) Considering the general presumption against preemption, we narrowly construe the precise language of the federal law or regulation to determine whether a particular state law claim is preempted. (*Gibson, supra,* at p. 1301; *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1066–1067 [31 Cal.Rptr.2d 358, 875 P.2d 73].) "As to each state law claim, the central inquiry is whether the legal duty that is the predicate of the [claim] constitutes a requirement or prohibition of the sort that federal law expressly preempts. [Citations.]" (*Gibson,* at p. 1301.)

"Three forms of preemption may occur: (1) where Congress expressly specifies that its enactment preempts state law (express preemption); (2) where the scheme of federal regulation is so pervasive that there is a reasonable inference Congress intended to dominate the field and state laws on the same subject are precluded (field preemption); and (3) where federal law actually conflicts with state law and it is impossible for a private party to comply with both requirements (conflict preemption). [Citations.]"[7] (*Monarch v. Southern Pacific Transportation Co., supra,* 70 Cal.App.4th at pp. 1204–1205.)

■ When the issues regarding federal preemption involve undisputed facts, it is a question of law whether a federal statute or regulation preempts a state law claim and, on appeal, we independently review a trial court's determination on that issue of preemption. (*Washington Mutual Bank v. Superior Court, supra,* 95 Cal.App.4th at p. 612; *American Internat. Group, Inc. v. Superior Court* (1991) 234 Cal.App.3d 749, 755 [285 Cal.Rptr. 765].) Because the interpretation of statutes and administrative regulations and the ascertainment of legislative or regulatory agency intent are purely questions of law, "we determine the preemptive effect of either statutes or regulations independently [citation], without deferring to the trial court's conclusion or limiting ourselves to the evidence of intent considered by the trial court [citation]." (*Gibson v. World Savings & Loan Assn., supra,* 103 Cal.App.4th at p. 1297.)

B

■ The NBA empowers national banking associations (e.g., Bank) to exercise "all such incidental powers as shall be necessary to carry on the

---

[7] In its brief, Bank argues Smith's causes of action were *expressly* preempted by OCC regulations, presumably abandoning any argument his causes of action were barred by either field preemption or conflict preemption.

business of banking; [e.g.,] . . . by receiving deposits . . . ." (12 U.S.C. § 24 (Seventh).) "As the administrator charged with supervision of the [NBA] [citations], the [OCC] bears primary responsibility for surveillance of 'the business of banking' authorized by [title 12 United States Code section 24 (Seventh)]." (*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.* (1995) 513 U.S. 251, 256 [130 L.Ed.2d 740, 115 S.Ct. 810].) We give great weight to any reasonable construction of a regulatory statute adopted by the OCC. (*Id.* at pp. 256–257.)

The OCC (or its predecessor agency) promulgated "Regulation DD" (12 C.F.R. § 230.1 et seq. (2005); all further citations to the Code of Federal Regulations are to the 2005 edition) to implement the disclosure requirements for national banking associations set forth in the Truth in Savings Act (12 U.S.C. § 4301 et seq.) (TISA).[8] Regulation DD generally provides: "State law requirements that are inconsistent with the requirements of [TISA] and this part are preempted to the extent of the inconsistency." (12 C.F.R. § 230.1(d).) Effective February 12, 2004, the OCC issued 12 Code of Federal Regulations part 7.4007, which provides specific preemption rules in the context of a national banking association's *deposit-taking* powers:

"(a) *Authority of national banks.* A national bank may receive deposits and engage in any activity incidental to receiving deposits, including issuing evidence of accounts, subject to such terms, conditions, and limitations prescribed by the [OCC] and any other applicable Federal law.

"(b) *Applicability of state law.* (1) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized deposit-taking powers are not applicable to national banks.

"(2) *A national bank may exercise its deposit-taking powers without regard to state law limitations concerning:* [¶] . . . [¶] (iii) *Disclosure requirements*; [¶] . . . [¶]

"(c) *State laws that are not preempted. State laws on the following subjects are not inconsistent with the deposit-taking powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking powers:* [¶] (1) *Contracts*; [¶] (2) *Torts*; [¶] . . . [¶] (8) Any other law the effect of which the OCC

---

[8] Title 12 United States Code section 4301(b) provides in part: "It is the purpose of [TISA] to require the clear and uniform disclosure of—[¶] . . . [¶] (2) the fees that are assessable against deposit accounts, so that consumers can make a meaningful comparison between the competing claims of depository institutions with regard to deposit accounts."

determines to be incidental to the deposit-taking operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section." (69 Fed.Reg. 1904, 1916 (Jan. 13, 2004), some italics added, fns. omitted.)[9]

Regulation DD sets forth the following disclosure requirements for depository institutions:

"(a) *Form.* Depository institutions shall make the disclosures required by [12 Code of Federal Regulations] §§ 230.4 through 230.6 and § 230.10 of this part, as applicable, *clearly and conspicuously, in writing,* and in a form the consumer may keep. Disclosures for each account offered by an institution may be presented separately or combined with disclosures for the institution's other accounts, as long as it is clear which disclosures are applicable to the consumer's account.

"(b) *General. The disclosures shall reflect the terms of the legal obligation of the account agreement between the consumer and the depository institution. . . .*" (12 C.F.R. § 230.3, some italics added.)

On the opening of a deposit account, 12 Code of Federal Regulations part 230.4 requires a depository institution to make certain disclosures to a consumer, including: "(b) *Content of account disclosures.* Account disclosures shall include the following, as applicable: [¶] . . . [¶] (4) Fees. *The amount of any fee that may be imposed in connection with the account (or an explanation of how the fee will be determined) and the conditions under which the fee may be imposed.*"[10] (Some italics added.) If a depository institution subsequently makes any change in those terms, 12 Code of Federal Regulations part 230.5 requires the institution to give the consumer advance notice of that change:

---

[9] 12 Code of Federal Regulations part 7.4009 similarly provides: "(b) *Applicability of state law.* Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its powers to conduct activities authorized under Federal law do not apply to national banks. [¶] (c) *Applicability of state law to particular national bank activities.* (1) The provisions of this section govern with respect to any national bank power or aspect of a national bank's operations that is not covered by another OCC regulation specifically addressing the applicability of state law. [¶] (2) *State laws on the following subjects are not inconsistent with the powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national bank powers*: [¶] (i) *Contracts*; [¶] (ii) *Torts*; [¶] . . . [¶] (viii) Any other law the effect of which the OCC determines to be incidental to the exercise of national bank powers or otherwise consistent with the powers set out in paragraph (a) of this section." (Some italics added.)

[10] Likewise, title 12 United States Code section 4303 requires a depository institution to "maintain a schedule of fees . . . and terms and conditions applicable to each class of accounts offered by the depository institution, in accordance with the requirements of this section and regulations which the [OCC] shall prescribe" including "[a] description of all fees . . . which may be charged or assessed against the account . . . and the conditions under which any such amount will be assessed."

"(a) *Change in terms*—(1) Advance notice required. *A depository institution shall give advance notice to affected consumers of any change in a term required to be disclosed under* [*12 Code of Federal Regulations*] § *230.4(b) of this part if the change may* reduce the annual percentage yield *or adversely affect the consumer. The notice shall include the effective date of the change.* The notice shall be mailed or delivered at least 30 calendar days before the effective date of the change."[11] (Some italics added.)

## C

Bank concedes the NBA and OCC regulations do *not* preempt *all* UCL causes of action.[12] (Off. of Comptroller of the Currency, advisory letter (March 22, 2002), p. 3, fn. 2 ["A number of state laws prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions. *See, e.g.,* Cal. Bus. Prof. Code 17200 *et seq.* and 17500 *et seq.*"]; cf. *Gibson v. World Savings & Loan Assn., supra,* 103 Cal.App.4th at pp. 1306–1307 [UCL claim against federal savings association based on violation of regulations of the Office of Thrift Supervision (OTS) was not preempted]; *Fenning v. Glenfed, Inc.* (1995) 40 Cal.App.4th 1285, 1289, 1299 [47 Cal.Rptr.2d 715] [UCL action against federal savings and loan association based on violation of OTS regulations was not preempted]; *Lopez v. World Savings & Loan Assn.* (2003) 105 Cal.App.4th 729, 741–742 [130 Cal.Rptr.2d 42] ["UCL remains available to remedy a myriad of potential unfair, unlawful, and fraudulent practices engaged in by federally chartered savings and loan associations, so long as the practice is outside the scope of federal regulation."].) Rather, Bank argues, and Smith disagrees, that his *specific* UCL cause of action is preempted, as a matter of law, by the NBA and OCC regulations. (Cf. *Roskind v. Morgan Stanley Dean Witter & Co.* (2000) 80 Cal.App.4th 345, 351 [95 Cal.Rptr.2d 258] ["[T]he UCL could potentially provide a remedy for the conduct in issue here, if the UCL is not preempted by federal law in this context."].) In independently deciding that question of law, we first review UCL causes of action generally and then consider Smith's UCL cause of action.

Section 17200 of the UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive,

---

[11] Title 12 United States Code section 4305(c) requires a depository institution to give a consumer at least 30 days' advance notice if "any change is made in any term or condition which is required to be disclosed" and "the change may . . . adversely affect any holder of the account . . . ."

[12] In Bank's brief, it states it "does not take the position that the UCL and CLRA are preempted in their entirety, but only to the extent these state statutes are used to impose certain disclosure requirements on national banks."

untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 . . . ." Therefore, an act or practice is "unfair competition" under the UCL if it is forbidden by law or, even if not specifically prohibited by law, is deemed an unfair act or practice. As the California Supreme Court stated in *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, at page 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937]: "Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices. [Citation.] In addition, under section 17200, 'a practice may be deemed unfair even if not specifically proscribed by some other law.' [Citation.]" The remedies available under the UCL are "cumulative . . . to the remedies or penalties available under all other laws of this state." (§ 17205.) "Under [section 17204], a private plaintiff may bring a UCL action even when 'the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action.' [Citation.]" (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950 [119 Cal.Rptr.2d 296, 45 P.3d 243], quoting *Stop Youth Addiction, Inc. v. Lucky Stores, Inc., supra,* 17 Cal.4th at p. 565.) "[I]n enacting the UCL itself, and not by virtue of particular predicate statutes, . . . the Legislature has conferred upon private plaintiffs 'specific power' [citation] to prosecute unfair competition claims." (*Stop Youth Addiction, Inc., supra,* at p. 562.)[13]

By "borrowing" violations of other laws, the UCL deems those violations "unfair competition" independently actionable under the UCL. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) "Virtually any law— federal, state or local—can serve as a predicate for a section 17200 action. [Citation.]" (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1102–1103 [53 Cal.Rptr.2d 229], disapproved on another ground in *Cel-Tech,* at pp. 184–185.) Therefore, a violation of a federal law or regulation "may serve as a predicate for a [UCL] action. [Citations.]" (*Roskind v. Morgan Stanley Dean Witter & Co., supra,* 80 Cal.App.4th at p. 352.)

Smith asserts on appeal (as he did in the trial court) his UCL cause of action is not preempted to the extent it is based on the predicate act of Bank's

---

[13] We note, however, that on November 2, 2004, Proposition 64 passed, amending section 17204 to delete language expressly authorizing any person acting for the interests of the general public to bring a UCL cause of action, and to add language expressly authorizing "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition" to bring a UCL cause of action.

alleged violation(s) of OCC regulations regarding disclosure.[14] Violations of OCC regulations, as with violations of any federal statute or regulation, may constitute a predicate act for a UCL cause of action. (*Roskind v. Morgan Stanley Dean Witter & Co.*, supra, 80 Cal.App.4th at p. 352.) We therefore examine Smith's specific assertions regarding Bank's alleged violations of OCC regulations to determine whether his UCL cause of action is preempted as a matter of law to the extent it is based on those predicate acts. Smith asserts Bank did not adequately disclose information regarding its May 2002 change of policy that extended to Check Card POS transactions the "shadow line" overdraft feature, thereby violating certain disclosure requirements set forth in OCC regulations.

As noted *ante*, OCC regulations required Bank to "clearly and conspicuously, in writing" (12 C.F.R. § 230.3(a)) disclose the terms of its account agreements with consumers, including the *"amount of any fee* that may be imposed in connection with the account (or an explanation of how the fee will be determined) *and* the *conditions under which the fee may be imposed."* (12 C.F.R. § 230.4(b)(4)), italics added; see 12 U.S.C. § 4303 for similar requirements and OCC's authority to issue the regulations described *ante.*) Furthermore, OCC regulations required Bank to give a consumer 30 days advance notice *"of any change in a term required to be disclosed under [12 Code of Federal Regulations part] 230.4(b) . . . if the change may . . . adversely affect the consumer."* (12 C.F.R. § 230.5(a), italics added; see 12 U.S.C. § 4305(c) for similar requirements.) That advance notice of a change in a term "shall include the *effective date of the change."* (12 C.F.R. § 230.5(a), italics added.) Smith argued below in opposition to Bank's motions, and argues on appeal, that Bank violated those OCC disclosure requirements by omitting from the notice in his March 19, 2002 monthly account statement disclosures regarding: (1) the *amount* of the fee(s) that may be charged due to Bank's change in policy regarding Check Card POS transactions involving insufficient funds or overdrafts and the *conditions* under which such fees may be imposed in those transactions; and (2) the *effective date* of that change.[15] We conclude those alleged violations of OCC regulations may constitute predicate acts underlying Smith's UCL cause of action.

■ Bank apparently does not argue on appeal that those alleged violations of OCC regulations could not, as a matter of law, constitute predicate

[14] As discussed *post*, Smith also asserts his UCL cause of action is not preempted to the extent it is based on the predicate act of Bank's breach of its account agreement regarding its contractual disclosure obligations.

[15] By limiting our discussion to those two alleged violations, we do not intend to imply Smith may not have other valid theories for UCL liability based on other violations of OCC disclosure requirements or other predicate acts not preempted by OCC regulations or other federal law.

acts underlying Smith's UCL cause of action. Rather, Bank appears to argue the newly-issued OCC preemption regulation quoted *ante* (i.e., 12 C.F.R. § 7.4007) preempts Smith's UCL cause of action, even if it is based on violations of OCC disclosure regulations. We conclude Bank's argument is both illogical and based on an incorrect interpretation of that OCC preemption regulation. As quoted *ante*, 12 Code of Federal Regulations part 7.4007 provides that: "A national bank may exercise its deposit-taking powers *without regard to state law limitations concerning:* [¶] . . . [¶] (iii) *Disclosure requirements* . . . ." (12 C.F.R. § 7.4007(b)(2), italics added.) Bank argues that because Smith's UCL cause of action is based on a "state law" (i.e., the UCL) and "concerns" Bank's disclosure requirements, that cause of action is necessarily preempted by 12 Code of Federal Regulations part 7.4007(b)(2)). However, in so arguing, Bank disregards the term "limitations" in that regulation. Based on our independent construction of the plain and unambiguous language of 12 Code of Federal Regulations part 7.4007(b)(2), we conclude that regulation preempts only "state law *limitations*" that concern Bank's disclosure requirements. (*Korea Supply Co. v. Lockheed Martin Corp.*, *supra*, 29 Cal.4th at p. 1146 ["If the language of the statute is unambiguous, the plain meaning governs."].) To the extent Smith's UCL cause of action is based on the predicate act of Bank's alleged violations of disclosure requirements *under OCC regulations*, that cause of action merely seeks to enforce *federal* regulations concerning disclosure requirements. It does *not* involve or seek to impose any *state* law *limitation* or other *state* requirement regarding disclosure. Therefore, it is illogical for Bank to argue the federal preemption regulation (i.e., 12 C.F.R. § 7.4007(b)(2)) preempts Smith's state cause of action to effectively enforce federal disclosure requirements.[16] Because Smith's UCL cause of action is *not* based on a predicate act involving an alleged violation of a state law requiring (or limiting) certain disclosures by Bank, it is *not* preempted by 12 Code of Federal Regulations part 7.4007(b)(2).[17]

Furthermore, other provisions of 12 Code of Federal Regulations part 7.4007 support our conclusion that Smith's UCL cause of action based on an alleged violation of OCC's disclosure requirements is not preempted. In particular, 12 Code of Federal Regulations part 7.4007(c) provides that state laws are not preempted "to the extent that they only incidentally affect" a national bank's deposit-taking powers, including state laws on contracts and torts. To the extent Smith's UCL cause of action is based on Bank's alleged

---

[16] Bank apparently does not argue (and could not successfully argue) that only federal courts have jurisdiction over actions to enforce violations of OCC or other federal agency disclosure regulations. (See, e.g., *Gibson v. World Savings & Loan Assn., supra,* 103 Cal.App.4th at pp. 1299–1304.)

[17] Because we construe 12 Code of Federal Regulation part 7.4007(b)(2) in this manner, we need not address Smith's assertion that it should not be applied retroactively.

violations of OCC disclosure requirements, it only "incidentally affect[s]" Bank's deposit-taking powers and is, in effect, a tort cause of action based on alleged violations of federal disclosure requirements applicable to Bank regardless of the UCL. Similarly, it cannot be reasonably, much less persuasively, argued that Smith's UCL cause of action based on alleged violations of OCC disclosure requirements involves a state law that "obstruct[s], impair[s], or condition[s]" Bank's ability to fully exercise its deposit-taking powers. (12 C.F.R. § 7.4007(b)(1).) None of the cases cited by Bank (e.g., *Rosenberg v. Washington Mut. Bank* (2004) 369 N.J. Super. 456 [849 A.2d 566]) are apposite to this case or otherwise persuade us to conclude Smith's UCL cause of action based on that alleged predicate act is preempted by federal law. On the contrary, the most apposite cases tend to support our conclusion that Smith's UCL cause of action based on alleged violations of federal regulations is not preempted. (*Gibson v. World Savings & Loan Assn.*, *supra*, 103 Cal.App.4th at pp. 1299–1304; *Fenning v. Glenfed, Inc.*, *supra*, 40 Cal.App.4th at pp. 1296–1299.)

D

Smith also asserts on appeal (as he did in the trial court) his UCL cause of action is not preempted to the extent it is based on the predicate act of Bank's breach of its contractual disclosure obligations under its account agreement. Because we conclude that Smith's UCL cause of action is not preempted based on Bank's alleged violations of federal disclosure regulations, we need not necessarily decide whether his UCL cause of action is also not preempted to the extent it is based on Bank's alleged breach of its account agreement. Nevertheless, it appears that a systematic breach of certain types of contracts (e.g., breaches of standard consumer or producer contracts involved in a class action) can constitute an unfair business practice under the UCL. (See *Gibson v. World Savings & Loan Assn.*, *supra*, 103 Cal.App.4th at pp. 1302–1304, 1306; *State Farm Fire & Casualty Co. v. Superior Court*, *supra*, 45 Cal.App.4th at p. 1104; *Orkin Exterminating Co., Inc. v. F.T.C.* (11th Cir. 1988) 849 F.2d 1354, 1367–1368; *Allied Grape Growers v. Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 449–453 [249 Cal.Rptr. 872].) As noted *ante*, Bank's account agreement with Smith provided that: "You agree to pay all fees and follow all practices described in the **Consumer Disclosure Statement** . . . . [¶] . . . [¶] You agree to abide by all future changes to the terms and fees for your accounts. . . . *We agree to notify the first signer of the account in advance of any such fee changes.*" (Italics added.)

In opposing Bank's motions, Smith argued his UCL cause of action was not preempted to the extent it was based on the predicate act of breach of the account agreement by Bank's failure to notify him in advance of its change in policy regarding overdrafts for Check Card POS transactions and the fees

imposed for such overdrafts. Bank's contractual obligation to disclose changes in fees or other material account terms is separate from and therefore is not necessarily the same as its disclosure requirements under Regulation DD. "Contractual duties are voluntarily undertaken by the parties to the contract, not imposed by state [or federal] law." (*Gibson v. World Savings & Loan Assn., supra,* 103 Cal.App.4th at p. 1302.) "While it is true that parties may not contract for less notice than that required by a federal regulation, *the parties are free to contract for more stringent notice than those contained in the federal regulations.* [Citation.]" (*Denelsbeck v. Wells Fargo & Co.* (Minn. 2003) 666 N.W.2d 339, 348, italics added.)

Contrary to Bank's assertion, 12 Code of Federal Regulations part 7.4007 does *not* preempt a UCL cause of action based on the predicate act of a systematic breach of its contractual disclosure obligations. In fact, 12 Code of Federal Regulations part 7.4007(c) expressly recognizes that states' contract laws are *not* preempted "to the extent that they only *incidentally affect* the exercise of national banks' deposit-taking powers . . . ." (Italics added.) As *Gibson* concluded: "The duties to comply with contracts and the laws governing them and to refrain from misrepresentation, together with the more general provisions of the UCL, are principles of general application. They are not designed to regulate lending and do not have a disproportionate or otherwise substantial effect on lending. To the contrary, they are part of the legal infrastructure that undergird all contractual and commercial transactions. Therefore, *their effect is incidental and they are not preempted.*" (*Gibson v. World Savings & Loan Assn., supra,* 103 Cal.App.4th at pp. 1303–1304, italics added.) Likewise, the United States Supreme Court noted "a contractual requirement, although only enforceable under state law, is not 'imposed' by the State, but rather is 'imposed' by the contracting party upon itself." (*Cipollone v. Liggett Group, Inc., supra,* 505 U.S. at p. 526, fn. 24.) Because enforcement of a contractual obligation under a state's general laws on contracts only incidentally affects, at most, a national bank's deposit-taking powers, Smith's UCL cause of action based on the predicate act of a systematic breach of its contractual disclosure obligations is not, as a matter of law, preempted by federal law.[18]

E

We conclude Smith did not waive the UCL predicate act legal theories discussed in parts II.C. and II.D., *ante,* by raising them (apparently for the

---

[18] Furthermore, applying similar reasoning as applied in part II.C., *ante,* regarding the UCL predicate act of violation of federal disclosure regulations, 12 Code of Federal Regulations part 7.4007(b)(2) does not apply to preempt Smith's UCL cause of action based on the predicate act of a systematic breach of a contractual disclosure obligation. Specifically, enforcement of a breach of contract under a state's general law on contracts does not constitute a "state law *limitation*" concerning disclosure requirements. (12 C.F.R. § 7.4007(b)(2), italics added.)

first time) during oral argument on the trial court's tentative ruling on Bank's motions. Bank argues that because Smith did not specifically allege those legal theories in his pleadings and did not request leave to amend his pleadings, he waived those theories and cannot raise them now on appeal.

First, as Smith notes, the trial court did *not* explicitly (or implicitly) grant Bank's motions on the ground that Smith's pleadings did not adequately raise those UCL predicate act legal theories. Rather, the court presumably allowed Smith to raise and argue those UCL legal theories, yet expressly found those legal theories of liability were preempted by federal law. (Cf. *Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1664 [42 Cal.Rptr.2d 669] ["The trial court, however, did not rest its grant of summary judgment on [the ground of failure to allege certain theories of liability in opposition to motion]. Had it done so, the [plaintiffs] would have been entitled to seek leave to amend their complaint before entry of judgment so as to allege these omitted theories. Instead, the trial court reached the merits." (Fn. omitted.)].)

Second, the test of the adequacy of a complaint is whether it alleges sufficient *facts* to support a particular cause of action and not whether it expressly alleges legal theories of liability underlying a cause of action. A complaint is adequate if its factual allegations are sufficient to support a cause of action on any available legal theory (whether specifically pleaded or not). (*Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 908 [274 Cal.Rptr. 186].) If sufficient facts are alleged showing entitlement to relief under *any possible* legal theory, it is error for a trial court to dismiss an action without leave to amend on demurrer (or a motion for summary judgment) on the ground the complaint does not adequately raise that legal theory of liability. (*Platt v. Coldwell Banker Residential Real Estate Services* (1990) 217 Cal.App.3d 1439, 1444 [266 Cal.Rptr. 601].) Therefore, to the extent Bank argues on appeal that Smith waived its violation of OCC regulations and breach of contract legal theories of UCL liability by not expressly raising those theories in his complaint, Bank misconstrues applicable California law on the adequacy of pleadings. Smith did not waive those legal theories of UCL liability by not raising them in his complaint.[19]

Finally, to the extent Bank argues Smith's complaint did not sufficiently allege facts (or legal theories) in support of his UCL cause of action, it appears the trial court would have abused its discretion had it dismissed that cause of action without leave for Smith to amend his complaint. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d

---

[19] Even had Smith not raised those legal theories at oral argument below, he nevertheless could raise them on appeal to refute Bank's argument that his complaint is inadequate for not specifically alleging those legal theories. (*Grinzi v. San Diego Hospice Corp.* (2004) 120 Cal.App.4th 72, 85 [14 Cal.Rptr.3d 893].)

569].) At oral argument on Bank's motions, Smith effectively requested leave to amend his pleadings were the trial court to conclude they did not adequately allege facts (or legal theories) to support his UCL cause of action based on the predicate acts of violation of OCC regulations and breach of contract. In particular, Smith argued: "I'm not giving up my contract claim. [Bank] says it's not in our Complaint. Complaints can be fixed. . . . So if there's any concern about the record here that we haven't specifically alleged a systematic breach of contract as one of the predicate acts your Honor can act upon which is not preempted by the very terms of this regulation, we'll be happy to take the time to amend the Complaint."[20] To the extent those predicate·acts, if specifically alleged, would have been sufficient to support his UCL cause of action on the legal theories discussed in parts II.C. and II.D., *ante*, the trial court presumably would have abused its discretion had it denied Smith's request for leave to amend the complaint. (*Ibid.*; *Platt v. Coldwell Banker Residential Real Estate Services, supra,* 217 Cal.App.3d at p. 1444; *Bostrom v. County of San Bernardino, supra,* 35 Cal.App.4th at pp. 1663–1664.)

"Where the complaint is defective, '[i]n the furtherance of justice great liberality should be exercised in permitting a plaintiff to amend his complaint, and it ordinarily constitutes an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment. [Citations.]' " (*Scott v. City of Indian Wells* (1972) 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137].) Furthermore, the timing of Smith's request to amend was adequate. (Cf. *Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1069, fn. 7 [14 Cal.Rptr.2d 604] [request to amend in motion for reconsideration of summary judgment was timely because it was made before entry of judgment].) In any event, had Smith not requested leave to amend his complaint, we nevertheless would be entitled to review on appeal a purported abuse of discretion by the trial court had it dismissed his UCL cause of action without leave to amend. (*Scott,* at p. 550; *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 971 [9 Cal.Rptr.2d 92, 831 P.2d 317]; *Economic Empowerment Foundation v. Quackenbush* (1997) 57 Cal.App.4th 677, 684, fn. 5 [67 Cal.Rptr.2d 323].) Accordingly, we conclude Smith did not waive the UCL predicate act legal theories discussed in parts II.C. and II.D., *ante,* by raising them during oral argument on the trial court's tentative ruling on Bank's motions.

F

Because the parties essentially consider Smith's CLRA cause of action tobe based on substantially the same predicate acts as his UCL cause of action,

---

[20] Smith also requested the opportunity to submit supplemental briefing on the issue of preemption of his UCL cause of action based on the predicate act of violation of OCC regulations. The trial court implicitly denied that request.

we apply our reasoning in parts II.C. and II.D., *ante*, to similarly conclude his CLRA cause of action is not preempted by federal law. Furthermore, we apply our reasoning in part II.E., *ante*, to similarly conclude Smith did not waive those CLRA predicate act legal theories by raising them during oral argument on the trial court's tentative ruling on Bank's motions.

G

We further conclude Smith's section 17500 false and misleading advertising cause of action is not preempted by federal law.[21] Because Smith's false and misleading advertising cause of action is predicated, at least in part, on Bank's violation of federal banking laws and regulations on required disclosures and prohibited misleading or misrepresentative advertising, that cause of action, as with his UCL and CLRA causes of action, is not preempted under the same reasoning applied in part II.C., *ante*, which reasoning we incorporate herein. In addition to the disclosures required by federal statutes and OCC regulations, as discussed in part II.C., *ante*, title 12 United States Code section 4302(e) provides that no depository institution "shall make any *advertisement, announcement, or solicitation* relating to a deposit account that is *inaccurate or misleading or that misrepresents its deposit contracts.*" (Italics added.) Smith's complaint alleged that: "24. [Bank's] use of various forms of media to market, advertise, call attention to or give publicity to the terms and conditions of its financial services, including their checking accounts and [C]heck [C]ard program, *deceptively misrepresented certain of its attributes and characteristics* including, but not limited to, its use as a credit card-type account without extending credit and yet more convenient tha[n] using checks when, in fact, [Bank's] *practices materially differed from that advertised by imposing 'overdraft protection' with an overdraft fee per transaction unlike either a credit card or check*, constitutes unfair competition and unfair, deceptive, untrue or misleading advertising within the meaning of . . . § 17500, *et seq* . . . ." (Italics added.) Therefore, the complaint's alleged facts support a legal theory of liability for false and misleading advertising based on the

---

[21] Section 17500 provides: "It is unlawful for any person, firm, corporation or association . . . with intent directly or indirectly . . . to perform services . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, . . . any statement, . . . circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

predicate act(s) of violation of federal statutes and regulations regarding required disclosures and prohibited misleading or misrepresentative advertising.[22]

Smith also argued in opposition to Bank's summary adjudication motion that its marketing materials were misleading and deceptive because they did not disclose its new overdraft policy regarding Check Card POS transactions. Accordingly, applying our reasoning from part II.C., *ante*, we conclude Smith's false and misleading advertising cause of action is not preempted. Furthermore, we apply our reasoning in part II.E., *ante*, to similarly conclude Smith did not waive his false and misleading advertising predicate act legal theory by raising it during oral argument on the trial court's tentative ruling on Bank's motions.

## III

### *Triable Issues of Material Fact*

Smith contends there are triable issues of material fact that preclude summary adjudication of his UCL and false and misleading advertising causes of action and a no-merit determination of his CLRA cause of action.

Bank's motions for summary adjudication and a no-merit determination were based primarily on a preemption defense, which we reject. Bank alternatively argued its disclosures regarding its Check Card POS transaction overdraft policy change were adequate as a matter of law, essentially arguing the facts regarding its disclosures were uncontroverted and, based on those facts, it was entitled to judgment in its favor. Bank argued the undisputed facts show, as a matter of law, its disclosure in Smith's March 19, 2002 monthly account statement was clear and conspicuous, meaningful, and not likely to mislead members of the public. In opposition, Smith essentially

---

[22] Although the trial court apparently construed the term "advertising" under section 17500 narrowly, that term is "sufficiently broad to include false or misleading statements made to the public by banking institutions in connection with their loans [or deposit accounts]." (*Chern v. Bank of America* (1976) 15 Cal.3d 866, 875–876 [127 Cal.Rptr. 110, 544 P.2d 1310].) *Chern* concluded that under section 17500 "a statement is false or misleading if members of the public are likely to be deceived." (*Chern*, at p. 876.) Furthermore, the California Supreme Court has noted that California's false advertising laws prohibit "not only advertising that is false, but also advertising [that,] although true, is either actually misleading or . . . has a capacity, likelihood or tendency to deceive or confuse the public." (*Leoni v. State Bar* (1985) 39 Cal.3d 609, 626 [217 Cal.Rptr. 423, 704 P.2d 183].) Therefore, contrary to the trial court's apparent belief, Smith's false and misleading advertising cause of action does not require Bank to have made an "affirmative misrepresentation." Rather, any advertising or other statements that may have a tendency to mislead the public (e.g., through failure to disclose Bank's Check Card POS transaction overdraft policy change) potentially could be found by a trier of fact to be false or misleading advertising under section 17500.

conceded Bank made the disclosures as set forth in Bank's separate statement of undisputed facts, but argued those disclosures were inadequate under law. Therefore, the parties disagreed regarding whether a trier of fact could reasonably *infer* that Bank's (presumably undisputed) disclosures were inadequate and false or misleading, as asserted by Smith.

As noted in part I., *ante*, in deciding whether Bank is entitled to summary adjudication, we "must . . . determine what any evidence [submitted by Smith] or inference [therefrom] *could show or imply to a reasonable trier of fact*." (*Aguilar, supra,* 25 Cal.4th at p. 856.) Therefore, if any evidence or reasonable inference therefrom shows or implies the existence of the required element(s) of a cause of action, the trial court was required to deny Bank's motion for summary adjudication because a reasonable trier of fact could find for Smith. (*Id.* at pp. 856–857.) "But if the court determines that all of the evidence presented by [Smith], and all of the inferences therefrom, show and imply [the existence of a required element of a cause of action] *only as likely as* [its nonexistence] *or even less likely*, it must then grant [Bank's] motion for summary [adjudication], even apart from any evidence presented by the [Bank] or any inferences drawn therefrom, because a reasonable trier of fact could not find for [Smith]." (*Id.* at p. 857, fn. omitted.) When Smith relies on inference rather than evidence, "he must all the same rely on an inference implying [the existence of a required element] *more likely than* [its nonexistence], either in itself or together with other inferences or evidence." (*Ibid.*) An "inference is reasonable if, and only if, it implies [existence of the element is] *more likely than* [its nonexistence]." (*Ibid.*)

Applying that standard, we conclude a reasonable trier of fact could infer from the undisputed facts regarding Bank's disclosures that the existence of all of the elements of Smith's causes of action is more likely than their nonexistence. (*Aguilar, supra,* 25 Cal.4th at p. 857.) A reasonable trier of fact could infer it is more likely that Bank's disclosures regarding its Check Card POS transaction overdraft policy change were *not* clear, conspicuous and meaningful and *were* likely to mislead members of the public. A trier of fact could reasonably infer Bank's disclosures regarding that policy change did not adequately disclose the change in fees (or the conditions under which fees would be imposed) or the effective date of the policy change. Bank did not show below, and does not show on appeal, that Smith cannot establish an element of any of his causes of action. (Code Civ. Proc., § 437c, subd. (o).) Accordingly, the trial court erred by granting Bank's motions for summary adjudication and for a no-merit determination.[23]

---

[23] Because we dispose of this appeal on the grounds discussed *ante*, we need not address Smith's final contention that the trial court abused its discretion by excluding part of his expert witness's declaration.

## DISPOSITION

The judgment is reversed and the matter is remanded with directions that the trial court vacate its order granting Bank's motion for summary adjudication and motion for a no-merit determination and enter a new order denying those motions. Smith is to recover his costs on appeal.

Nares, Acting P. J., and O'Rourke, J., concurred.

A petition for a rehearing was denied January 26, 2006, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied April 26, 2006, S141687. Baxter, J., Chin, J., and Corrigan, J., did not participate therein.