849 A.2d 566 (2004)
369 N.J. Super. 456
Jeffrey M. ROSENBERG and Joni L. Rosenberg, Plaintiffs-Appellants,
v.
WASHINGTON MUTUAL BANK, FA and Washington Mutual, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 2004.
Decided March 22, 2004.
*567 Marc L. Ackerman, argued the cause for appellants (Brodsky & Smith, attorneys; Mr. Ackerman and Evan J. Smith, on the brief).
Jeffrey J. Greenbaum, Newark, argued the cause for respondent (Sills Cummis Radin Tischman Epstein & Gross, attorneys; Mr. Greenbaum, of counsel; Mr. Greenbaum and Steven R. Rowland, on the brief).
Before Judges CONLEY, WECKER and WEISSBARD.
The opinion of the court is delivered by CONLEY, P.J.A.D.
In May 2000, plaintiffs obtained a thirtyyear, $225,000 loan from defendant Washington Mutual Bank, FA (WMBFA), which they used to buy a vacation home. They agreed to a type of adjustable rate mortgage (ARM) which offers several different types of payment options. At some point they stopped making payments and, in January 2003, filed a Superior Court, Law Division action against WMBFA and defendant Washington Mutual,Inc. (WM). The complaint seeks injunctive relief and damages for alleged consumer fraud violations and breach of contract. The crux of their complaint is that the billing statements, sent to them by WMBFA[1], are deceptive. Specifically, as characterized in their appellate brief:
the Complaint does not allege that [WMBFA] is not entitled to charge interest *568 on a mortgage, nor does it allege that [WMBFA] is not entitled to account for negative amortization on a loan, let alone be prohibited from collecting deferred interest or increased principal from its customers. Rather, the Complaint takes issue with the manner in which [WMBFA] advises its customers of the amount due each month and the effect such a monthly payment will have on [WMBFA's] New Jersey customers, including Plaintiffs. The Complaint further alleges that [WMBFA's] Monthly Loan Statement is deceptive in the manner it is presented to Plaintiffs and the class.
The focus of their state law claims, then, is upon WMBFA's billing disclosures, or alleged lack thereof. Concluding that federal law preempted these claims, the trial judge granted defendants' motion to dismiss. Although the parties engage in a discussion of a plethora of federal and other state law, we think it plain that the precise focus of plaintiffs' claims, i.e., WMBFA's billing disclosures, has been expressly preempted. Even if not preempted, we see nothing deceptive, inaccurate or fraudulent in the billing statements to support consumer fraud or breach of contract claims. Accordingly, we affirm.
Plaintiffs' complaints are occasioned by the type of interest and loan repayment plan they agreed to. Although the principal amount of the loan was $225,000, plaintiffs were advised in large, bold print, in the "Adjustable Rate Rider" (ARR) that was incorporated into the mortgage and signed by them, that:
THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN 125% OF THE ORIGINAL AMOUNT (OR $281,250.00). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.
The ARR explains that the interest rate is tied to an index. The index is the twelve-month average "of the annual yields on actively traded United States Securities" and is compiled by the Federal Reserve Board. Each month, WMBFA adds 2.75% to the index and that total is plaintiffs' interest rate until the next month, when the calculation is redone and a new rate is determined. The ARR also contains a "cap" provision, which provides that that maximum possible interest rate under this system is 11.5%.
Changes to the actual monthly payment, however, occur on a different schedule. According to the ARR, under most circumstances the monthly payment will remain within 7.5% above or below the previous monthly payment. Because of this limit, the ARR recognizes that plaintiffs' "monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal ... owe[d] at the monthly payment date in full on the maturity date in substantially equal payments." In situations where the payment is less than the recalculated monthly interest, the difference is added to the principal of the loan and accrues interest (Negative Amortization). In cases where the payment is more, the excess payment is applied to reduce the principal (Accelerated Amortization).
This system is subject to further limitations. Should the situation arise where *569 plaintiffs are "underpaying", the additions to principal are capped at 125% of the original principal. In the event that the principal would otherwise exceed 125% of the original principal, plaintiffs would be required to pay a new monthly payment notwithstanding the aforementioned 7.5% rule. This new monthly payment would be "an amount which would be sufficient to repay [the] then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments." The monthly payment calculation is revisited every five years and adjusted without regard to cap limitations.
Each month, WMBFA sent a loan statement to plaintiffs. The complaint includes the February 7, 2002, statement. It plainly shows how the adjustable rate and optional payment plans operate. We reprint that statement on page 6 so that the reader can easily see its clarity:
*570 
The following additional information is on the back of the loan statement, under the "Choosing Your Payment Options" section:
If your loan is an Adjustable Rate Mortgage with options, you may choose one of four payment options [as applicable]:
*571 Option 1: Minimum Amount Due
Gives you more cash now and helps keep current payments manageable. This amount may not be sufficient to pay all of the accrued interest for the month or to pay the loan in full over the remaining term in equal monthly installments. Therefore, negative amortization may result and any deferred interest will be added to the balance of your loan.
Option 2: Interest Only
Avoids deferred interest by paying the minimum amount due, plus the additional interest. Payments remain manageable, with no change in your principal balance for the month.
Option 3: Fully Amortized Payment
Pays all the interest due, reduces your principal in an amount sufficient to pay off your loan on schedule.
Option 4: Faster Equity Build Up
Calculated to amortize your loan based on a 15-year term from the first payment due date, resulting in substantial interest savings.
The option you selected may not be available if the payment for that option would be less than the minimum due. The amount shown on the statement for "Current Total Due" will be the minimum amount due.
WMBFA is a federally chartered savings association. See Washington Mut. Bank, FA v. Superior Court, 95 Cal. App.4th 606, 115 Cal.Rptr.2d 765, 770 (2002); Moskowitz v. Washington Mut. Bank FA, 329 Ill.App.3d 144, 263 Ill.Dec. 502, 768 N.E.2d 262, 263, app. denied, 201 Ill.2d 574, 271 Ill.Dec. 928, 786 N.E.2d 186 (2002). It is, therefore, subject to the regulatory authority of the federal Office of Thrift Supervision (OTS). Turner v. First Union Nat. Bank, 162 N.J. 75, 87, 740 A.2d 1081, 1088 (1999). That federal entity draws its authority from the Congressional enactment of the Home Owners' Loan Act (HOLA), 12 U.S.C.A. §§ 1461-1470. See 12 U.S.C.A. § 1464(a); Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 161, 102 S.Ct. 3014, 3026, 73 L.Ed.2d 664, 680 (1982); Turner v. First Union Nat. Bank, supra, 162 N.J. at 88, 740 A.2d 1081 (noting the observation in Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, supra, 458 U.S. at 161, 102 S.Ct. at 3026, 73 L.Ed.2d at 680, that "it would have been difficult for Congress to give the [Federal Home Loan] Bank Board [, OTS' predecessor agency,] a broader mandate.").
Congress specifically authorized OTS to preempt state laws affecting the operations of federal savings associations. 12 U.S.C. §§ 1463(a), 1464(a). OTS has done so. 12 C.F.R. § 560.2(a) provides:
Occupation of field. Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA.
To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform *572 federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section....
The preemptive reach of OTS' authority extends not only to state statutory and regulatory laws but to "any state ... ruling, order or judicial decision." 12 C.F.R. § 560.2(a) ("For purposes of this section, `state law' includes any state statute, regulation, ruling, order or judicial decision.").
Pertinent to plaintiffs' complaints about WMBFA's billing statements, 12 C.F.R. § 560.2(b)(9) expressly applies its preemption to:
(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents....
[Emphasis added.]
While 12 C.F.R. § 560.2(c) refers to state laws, including contract and tort laws, that are not preempted if "they only incidentally affect" the federally regulated institutions, OTS has made it clear that the "incidentally affect" analysis becomes critical only if the types of preempted areas set forth in 12 C.F.R. § 560.2(b) are not involved. In this respect, it has said:

[T]he first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.
[61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996) (emphasis added).]
Here, plaintiffs' state law claims clearly fall within 12 C.F.R. § 560.2(b)(9) as they assert that WMBFA's billing statements fail to convey, i.e., disclose, to the debtor that the "total amount due" figure is something other than what one normally would think of as a "total amount due." By way of either injunctive relief or monetary damages, plaintiffs seek to insert a form of state regulation by compelling a different type of billing statement disclosure. Miranda v. Fridman, 276 N.J.Super. 20, 34, 647 A.2d 167, 174 (App.Div.), certif. denied, 138 N.J. 271, 649 A.2d 1291 (1994). See American Bankers Ass'n v. Lockyer, 239 F.Supp.2d 1000, 1010-12 (E.D.Cal.2002) (state regulations over disclosures in credit card agreements informing cardholders of the financial effects of only remitting the minimum monthly payment preempted); Moskowitz v. Washington Mut. Bank, supra, 263 Ill.Dec. 502, 768 N.E.2d at 266 (consumer fraud and breach of contract claims premised on non-disclosure of a payoff statement fee preempted). Plaintiffs' cited cases do not involve state actions falling within 12 C.F.R. § 560.2(b)(9), Tuxedo Beach Club Corp. v. City Fed. Sav. Bank, 749 F.Supp. 635 (D.N.J.1990); Morse v. Mut. Fed. Sav. & Loan Ass'n of Whitman, 536 F.Supp. 1271 (D.Mass.1982); Gibson v. World Sav. & Loan Ass'n, 103 Cal.App.4th 1291, 128 Cal. Rptr.2d 19 (2002) and Fenning v. Glenfed, Inc., 40 Cal.App.4th 1285, 47 Cal.Rptr.2d 715 (1995), and are thus inapposite.
*573 Even were we to conclude that preemption does not exist, plaintiffs' state law claims are facially meritless. The premise for plaintiffs' complaints about the "total amount due" figure on the billing statement essentially relates to the "negative amortization" aspect of their ARM. The mortgage documents which plaintiffs signed clearly explain how this can occur. In essence, the rate adjustment formula and the payment adjustment formula are distinct. The difference in the formulas has the effect of placing a minimum on the payment due each month. The rate adjustment formula, however, can result in a figure higher than the payment under the payment adjustment formula. In this situation the minimum protects the mortgagor from having to make an exorbitant monthly payment. This protection, however, has a cost. The difference between the minimum amount and the amount which the rate adjustment formula dictates, if higher, becomes capitalized or added to the principal, and itself begins accruing interest. That is negative amortization. The ARM also provides additional caps on the adjustment percentage and total principal which can be permitted to accrue. All of these terms are plainly apparent in the mortgage documents. The language of the documents is complex, but not indecipherably so, and they are not voluminous, totaling fourteen pages.
As to the loan statement which plaintiffs assert fails to accurately reflect what the "total amount due is," it lists and defines the four payment options and defines each one on the reverse side. The payment stub reflects the minimum payment as the "Total Amount Due." That this is clear is reflected by the fact that the value associated with this term is equal to the value associated with the payment option labeled "Minimum payment due" listed above the perforated stub. That term is defined on the reverse side of the loan statement as the minimum amount discussed earlier. The option "Full principal and interest payment" is defined as the amount necessary to avoid negative amortization. Thus, while the stub specifies the "Total Amount Due", it has additional blanks where mortgagors can indicate how much they are actually remitting, and, if they are paying more than the minimum, where they wish to direct the surplus to be applied. There is nothing misleading or nondisclosed on the loan statement. The "Total Amount Due" is clearly the minimum payment required. It is equally clear that, depending upon variations in the rate adjustment formula, a minimum payment may trigger negative amortization.
Affirmed.
NOTES
[1] There are no separate claims against WM.