**Jeanne BIGGS, et al., Plaintiffs,**

v.

**EAGLEWOOD MORTGAGE LLC, et al., Defendants.**

**Civil No. PJM 07–2768.**

United States District Court, D. Maryland.

Sept. 17, 2008.

Mary Elizabeth Goulet, Whitham Curtis Christofferson and Cook PC, Reston, VA, for Plaintiff.

Richard L. Miller, Monshower Miller and Magrogan LLP, Columbia, MD, Glenn

A. Cline, Ballard Spahr Andrews and Ingersoll LLP, Baltimore, MD, for Defendants.

## OPINION

PETER J. MESSITTE, District Judge.

Plaintiffs Jeanne and Charles Biggs ("the Biggs") allege that Defendants Eaglewood Mortgage, LLC and Countrywide Bank N.A.,[1] individually and as co-conspirators, engaged in a mortgage scheme with the intent to defraud them. Countrywide has filed a Motion to Dismiss or, in the Alternative, for Summary Judgment as to all claims. In addition to opposing Countrywide's Motions, the Biggs have filed motions seeking summary judgment in their favor on their racketeering and conversion claims.[2] For the following rea-

1. Since this litigation began, Countrywide has been taken over by Bank of America. For the sake of convenience, Countrywide will continue to be referred to as "Countrywide."

2. After Countrywide's Motion was fully briefed and argued, the Biggs filed the motions requesting judgment in their favor on the racketeering and conversion claims. Such requests should have been made in the form of Cross–Motions for Summary Judgment at the time the Biggs filed their opposition to Countrywide's Motion. The Court, in any case, will refer to the Biggs' requests as Cross–Motions for Summary Judgment as to the racketeering and conversion claims.

3. A payment-option adjustable rate mortgage—also known as a flexible-payment ARM, pay-option ARM, option ARM, or PO—is considered nontraditional in that it allows the borrower to choose from a number of payment options. For example, the borrower may choose either a minimum payment option each month based on an introductory interest rate, an IO [interest only] payment option based on the fully indexed interest rate, or a fully amortizing principal-and-interest payment option based on a 15–or 30 year loan term plus any required escrow payments. The minimum payment option can be less than the interest accruing on the loan, resolution [sic—"resulting"?] in negative

sons, Countrywide's Motion to Dismiss is **GRANTED IN PART** and **MOOTED IN PART**; its Motion for Summary Judgment is **GRANTED IN PART** and **MOOTED IN PART**; and the Biggs' Cross–Motions for Summary Judgment are **DENIED**.

## I.

In their Amended Complaint, the Biggs assert that in 2004 Countrywide, through its agents and/or co-conspirators, made false statements to induce them to execute loan documents converting their 5.25% fixed-rate home mortgage with Chase Manhattan Mortgage Corporation into a payment option adjustable rate mortgage ("ARM")[3] with Countrywide, and in 2006 induced them to refinance through yet another payment option ARM with Countrywide.[4] The Biggs claim that these pay-

amortization. The IO option avoids negative amortization but does not allow principal amortization. After a certain number of years, or if the loan reaches a certain negative amortization cap, the required monthly payment amount is refigured to require payments that will fully amortize the outstanding balance over the remaining loan term.

*Glossary*, Community Investments Online, Vol. 18 No. 3 (December 2006), http://www.frbsf.org/publications/community/investments/0612/glossary.pdf, (last visited Sept. 16, 2008).

4. The Biggs also allege that in 2007, as part of Defendants' ongoing "scheme," they were induced to agree to a third payment option ARM, this time with American Home Mortgage or, in the alternative, that they were forced to refinance and accept the American Home Mortgage ARM because of the unfavorable transactions with Countrywide in 2004 and 2006. Countrywide received a pay-off of its 2006 payment option ARM out of the proceeds of the 2007 ARM with American Home Mortgage.

American Home Mortgage, which filed for bankruptcy before this suit was filed, is not a party to the suit.

The Biggs' claim as to its 2007 ARM with American Home Mortgage (AHM) is beyond any relief the Court could award as the case

ment option ARMs contained various high risk features, including an initial "teaser" interest rate, abruptly changing interest rates, negative amortization, and prepayment penalties, all of which were inappropriate for the Biggs, an elderly retired couple, Charles Biggs being 82 years of age and Jeanne Biggs 79 years of age as of the date suit was filed. The Biggs further allege that, by offering loans with these features, Defendants intended the Biggs' loan principal to increase substantially over time until the adjustable rate would kick in and their required monthly payment would increase substantially, at which time the Biggs would either be in default and be subject to foreclosure or, if they could afford the inflated payment, their modest monthly income would be depleted. According to the Biggs, any chance of refinancing the increased principal balance and prepayment penalties into a fixed-rate mortgage at that juncture would most likely prove impossible, since the requisite 80% loan-to-value ratio for a fixed rate loan could not then be met.

■ Against this background, the Biggs submit that Countrywide is liable to them for compensatory and punitive damages based on one or more of the following causes of action: Count I–Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.;* Count II—Conversion; Count III—Conspiracy; Count IV—Fraud or Fraudulent Misrepresentation; Count V—Negligent Misrepresentation; Count VI—Negligence; and Count VII—Punitive Damages.[5]

## II.

A. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). The court must consider all well-pled allegations in the complaint as true and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999). The court, however, need not accept conclusory factual allegations devoid of any reference to an actual event, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979), unsupported legal allegations, *Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir.1989), or legal conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and the facts must suffice to "state a claim to relief that is plausible on its face." *Bell*

presently stands, given that AHM is not a party to this suit. Among their prayers for relief, the Biggs ask the Court to hold the AHM mortgage unenforceable. But even if AHM were shown to be an agent or co-conspirator of Countrywide—and there is absolutely no evidence other than pure assertion by the Biggs that this is so apart from the fact that AHM and Countrywide have apparently done business together on several occasions—AHM would certainly be a necessary party to this litigation before the Court could make any declaration as to the enforceability *vel non* of the AHM loan. The fact of AHM's absence from the suit alone makes any consideration of that issue inappropriate.

**5.** There is no separate cause of action for punitive damages apart from an underlying cause of action upon which punitive damages can be grounded. This is true both as a matter of federal law, *see e.g. Green v. H & R Block,* 981 F.Supp. 951 (D.Md.1997), and state law, *e.g. Exxon Corp. v. Yarema,* 69 Md. App. 124, 516 A.2d 990 (1986). Although Countrywide has not raised the issue in its Motion, the Court will *sua sponte* dismiss Count VII. Since, as will be seen, no underlying causes of action survive Countrywide's Motion, it would be academic to discuss the re-pleadability of punitive damages.

*Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 1974, 167 L.Ed.2d 929 (2007).

B. Assuming a cognizable cause of action is stated, a party will be entitled to summary judgment if the evidence in the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court is obligated to view the facts and inferences drawn from the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. N.C. Theatres, Inc.,* 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A motion for summary judgment may be made by a defending party with or without supporting affidavits and documents, Fed.R.Civ.P. 56(b), but when the motion is properly made and supported, the plaintiff may not merely rely on allegations or denials in his or her own pleadings; he or she must respond with affidavits or other evidence. *Id.* at (e)(2).

## III.

In Count I of the Amended Complaint, the Biggs assert a claim under the federal RICO statute, which establishes civil liability on the part of those who engage in a pattern of racketeering activities causing harm to another's business or property. *See* 18 U.S.C. §§ 1962, 1964. Violation of § 18 U.S.C.1962 requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co. Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Under the statute, "a pattern of racketeering activity" requires, at a minimum, two predicate acts within a ten year period, while "racketeering activity" is defined in terms of a number of specific crimes, one of which is mail fraud. *See* 18 U.S.C. §§ 1961(1) and (5).

The Biggs allege that in July 2004 Countrywide formed an enterprise with Mortgage Equity Lenders and Equitable Settlement Services, LLC, which later included American Home Mortgage, Eaglewood Mortgage, LLC, and Settlement Solutions, to engage in a fraudulent mortgage scheme, and that Countrywide, through its agents or co-conspirators, used the United States Postal Service to transmit loan coupons, thank you cards, loan documents, executed agreements, and other mail in the course of and for the purpose of executing the alleged fraudulent scheme. This scheme allegedly occurred over a number of years and included placement of the Biggs into payment option ARMs in 2004 and 2006 with Countrywide. The Biggs submit that Countrywide has engaged in similar conduct in various parts of the country, fraudulently placing other homeowners into payment option ARMs with high risk features for which those homeowners were not suited.

Countrywide argues that because payment option ARMs are not inherently illegal, absent evidence of other fraudulent conduct the Biggs' mortgage transactions cannot constitute "racketeering activity" within the meaning of RICO. In any case, says Countrywide, the Biggs were hardly naive as to the various mortgage options available to them, since they have held twelve mortgages with at least ten different lenders over the years and, with respect to the 2006 transaction, as evidenced by the high number of credit inquiries on their credit report, they were in fact extraordinarily active shoppers for the best refinancing option available. Countrywide also argues that the Biggs' loan documents clearly identified the terms of the 2006 payment option ARM, including the so-called "risky" features with which the Biggs now take issue and that the documents it provided were in full compliance with the disclosure requirements of the federal Truth in Lending Act. 15 U.S.C. § 1601 *et seq.* In sum, says Countrywide, the mortgage transaction documents evidence no fraud and the Biggs have otherwise failed to proffer any other evidence of fraudulent representations attributable to it.

The first question in connection with Count I, taking their pleaded facts as true, is whether the Biggs have stated a RICO claim, *i.e.* is the count is subject to dismissal under Fed.R.Civ.P. 12(b)(6)? The issue, of course, is not whether the use of the U.S. mails can result in "racketeering activity" under RICO—certainly it can—the critical inquiry is whether the mails have been used to perpetrate a fraud.

The Biggs' theory of fraud is vague at best. Combing through the Amended Complaint and reviewing the transcript of oral argument, it appears that the Biggs are contending variously that payment option ARMS are fraudulent in general, and/or that the particular payment option ARMs in this case were fraudulent, and/or that such ARMS are fraudulent in general as to elderly persons of modest means, and/or that they were fraudulent as to the elderly Plaintiffs in this case. Whatever the precise theory, the illegality purportedly lies in the fact that payment option ARMS are part of a hard-sell on the part of banks, the high risk features of payment option ARMS are difficult to understand, and over time—in marked contrast to fixed rate mortgages—they are inordinately costly. The Biggs suggest that the difficulty in understanding payment option ARMs is compounded by the fact that in this case their loan disclosure documents appear to contain conflicting statements of precisely what payments were due from them and when.

Countrywide submits that payment option ARMs are not inherently illegal or wrongful, hence simply providing them cannot constitute a "racketeering activity" within the meaning of RICO. No case, according to Countrywide, has so held. *See e.g. Rosenberg v. Wash. Mut. Bank,* 369 N.J.Super. 456, 849 A.2d 566, 573 (2004) (finding that language of mortgage documents pertaining to a payment option ARM that included negative amortization was "complex, but not indecipherably so," and that "there was nothing misleading or nondisclosed on the loan statement.); *Cavin v. Home Loan Center, Inc.,* 469 F.Supp.2d 561 (N.D.Ill.2007) (finding in the context of pre-approved mortgage offers that low teaser rates, pay options and negative amortization features were not deceptive). On the other hand, the Court notes that the Attorneys General of California and Florida have filed actions against Countrywide containing allegations not unlike those in the suit at bar, including that certain of Countrywide's lending practices have been designed to maximize company profits and entice borrowers with "teaser rates" while misrepresenting the substantially larger payments that come

due later. *See e.g.* Complaint, *THE PEO-PLE OF THE STATE OF ILLINOIS V. COUNTRYWIDE FIN. CORP., ET AL,* No. 08–CH–22994 (Ill. Cir. Ct. Cook County June 25, 2008), in which the Attorney General for the State of Illinois alleges that from at least the year 2000 until the present Countrywide has aggressively marketed and offered reduced documentation loans and adjustable rate products including those with high risk features such as an initial "teaser" rate, prepayment penalties, and negative amortization and that Countrywide has enticed borrowers into loans with such features by failing to make clear and conspicuous disclosures of the products' risks. *See also* Martha Neil, *Another AG Sues Countrywide,* ABA Journal, July 1, 2008, http: //www.abajournal.com/news/another_ag_sues_countrywide (last visited July 2, 2008).

■ The foregoing actions, however, appear to have been brought under state consumer protection laws and not the federal RICO statute which, as Countrywide points out, is not a cause of action to be pled lightly. As the Fourth Circuit has "repeatedly noted," RICO actions require a continuous pattern of serious criminal activity: "RICO treatment is reserved for conduct 'whose scope and persistence pose a special threat to social well-being.'" *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 551 (4th Cir.2001), quoting *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989). RICO was not designed for, and cannot be applied to, "ordinary claims of fraud." *Int'l Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987). *See also Marketing Products Mgmt., LLC v. Healthandbeautydirect.com, Inc.,* 333 F.Supp.2d 418, 425 (D.Md.2004), quoting *Al–Abood v. El–Shamari,* 217 F.3d 225, 238 (4th Cir.2000). (The "Fourth Circuit has been particularly cautious 'about basing a RICO claim on predicate acts of mail and wire fraud ...'").

■ The Court agrees with Countrywide that fashioning a RICO claim out of the provision of payment option ARMS—whether to homeowners in general or to elderly homeowners of modest means in general or to the Biggs in particular—is highly problematic. But whether or not payment option ARMS can be deemed misleading in general or in specific cases and even assuming that a continuous pattern of misrepresentation relative to payment option ARMS on the part of Countrywide could be demonstrated, the Biggs' case clearly founders on the element of reliance. *See Chisolm v. TranSouth Fin. Corp.,* 95 F.3d 331, 337 (4th Cir.1996) (For civil RICO claim, "plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation"). Despite their protestations to the contrary, the Biggs cannot show that they justifiably or reasonably relied on any representation of Countrywide to their detriment.

The Biggs characterize themselves as elderly borrowers of modest means who, on the basis of high pressure sales tactics by Countrywide or its minions, were induced to leave their fixed rate mortgage with another lender and refinance with Countrywide, becoming enmeshed in not one, but two payment option ARMs. They say this happened first in 2004, then again in 2006. But in support of its Motion for Summary Judgment, Countrywide has produced unrefuted evidence of the Biggs' obvious sophistication in the matter of residential loans and ARMS in particular. Countrywide has demonstrated as a matter of law that the Biggs did not rely on any allegedly misleading representations about Countrywide's payment option ARMs.

Thus, Countrywide points out without contradiction that over the past 28 years the Biggs have refinanced their home mortgage no less than 12 times with at least 10 different lenders. They obtained

their first ARM in 1997 with Baltimore American Mortgage Corporation. The initial annual interest rate for that loan was 7.65%, subject to change in two years, tied to an index, with 6.990% to be added to the then current index to reach an adjusted interest rate. The maximum interest rate would be 10.65%. In 2003, the Biggs refinanced by obtaining a fixed rate (5.25%) 30 year mortgage with Chase Manhattan Bank, cashing out some $92,000 after paying off their existing loan balance. Less than one year later, in July 2004, the Biggs moved to their first ARM with Countrywide, taking out a $299,700 30–year mortgage. The initial interest rate was 1.75%, subject to adjustment as of October 1, 2004, tied to an index, with 2.75% to be added to the then current index, resulting in a new adjusted rate. The maximum interest rate would be 9.95%. The Biggs were given the option, on the payment change date, of making a monthly payment that would fully amortize unpaid principal at a slightly enhanced interest rate or a more limited payment, but in any case the note made clear that any unpaid monthly interest would be added to unpaid principal, *i.e.* there could be negative amortization. After five payment change dates, full monthly payments would be due.

Next came a loan transaction that the Biggs totally fail to discuss in their pleadings, though they do not deny it. In July 2006, after two years on the first Countrywide ARM loan and before being "induced" to refinance a second ARM loan with Countrywide, the Biggs entered into a 30 year fixed rate (5.25%) mortgage with

Suntrust Bank, cashing out (or, more precisely, applying to credit card debt) over $35,000. Then, *less than 2 months later*, in September 2006, Jeanne Biggs (but not Charles Biggs)[6] entered into their second ARM loan with Countrywide, admitting in the process that she had been shopping extensively among several prospective lenders for the most advantageous loan terms. The loan from Countrywide was for $465,000 which, according to the HUD–1 settlement sheet, netted the Biggs over $111,000. The term of the loan was 30 years, the initial annual interest rate was 2%, with an interest rate change date of November 1, 2006, tied to an index, and 3.575% to be added to the index to arrive at the adjusted rate. The maximum interest rate would never be greater than 9.95%. Unpaid monthly interest would be added to unpaid principal. The note gave the Biggs different payment options: interest only, fully amortized payments over the 30 year term, or fully amortized payments over a 15 year term. Unpaid interest would be added to principal. After 10 payment change dates, the minimum monthly payment would be at the fully amortized payment rate. From what appears in the record, there was no penalty due if the loan were prepaid.

This is the undisputed factual basis upon which the Biggs attempt to stake their RICO claim, specifically the claim that they were misled as to their interest obligations under the payment option ARMs, and that they were placed in loans not suitable to their ages or station in life.[7] The Court rejects the Biggs' RICO claim

---

**6.** Charles Biggs did, however, sign the Deed of Trust.

**7.** The Biggs also appear to claim that certain oral representations made by personnel of Eaglewood, Countrywide's "business partner," were misleading, *e.g.* "if the interest rate increases, you could refinance practically without charge" or "having a big principal

balance favors you," or that "we (Eaglewood, *et al.*) will take care of anything that might come up regarding the refinancing." However, a mere statement of intention or of opinion or prophecy is not a promise and the mere expression of an intention or willingness to do something does not constitute a promise or give rise to contractual liability unless made with promissory intent. S. Williston, *A*

as a matter of law. However aggressive Countrywide may have been in promoting its ARMs around the country in recent years, the Biggs simply cannot be considered to have relied on any of Countrywide's representations to their detriment. The undeniable fact is that at all relevant times, the Biggs were active and continuous shoppers of mortgage financing and that they possessed obvious and extensive experience with both fixed-rate loans and ARM loans. They also received substantial benefits in connection with the two Countrywide ARMs they now complain of, over $111,000 on the second one alone. They clearly knew, based on the 1997 ARM with Baltimore American Mortgage, that an ARM meant that the interest rate on the loan would be tied to an index and would be subject to an upward adjustment. They also knew from the 1997 ARM that unpaid interest would be added to unpaid principal, the obvious result being negative amortization. They knew that the interest rates on the ARMs were subject to a cap.[8] When fixed-rate mortgages were available, the Biggs took advantage of them. When ARMs offered better advantages, they opted for the ARMs; indeed, between their two ARMs with Countrywide, the Biggs held a fixed rate mortgage with Suntrust Bank. The fact that Countrywide's second ARM, as opposed to the first, may have offered different payment options makes little difference. The Biggs could easily have chosen as their payment option in connection with the 2006 ARM the same payment option available under the 2004 ARM or they could have opted for the fully amortizing principal and interest rate based on a 30–year loan term, which is what they presumably had with the fixed rate Suntrust loan they were supposedly induced to leave. The suggestion, therefore, that Countrywide somehow misled them is simply untenable, whatever duty lenders in some circumstances may be found to have with respect to ARMs.

Finally, any suggestion that Countrywide may have misrepresented the interest payments due from the Biggs under the 2006 ARM is flatly contradicted by the record. As Countrywide points out, the interest rates shown in the initial loan documents reflect the initial interest rates of the loan. Because the interest rate, by definition, was subject to adjustment over time depending on the index, the changing rates over the life of the loan could not be stated with any certainty, though to be sure a cap on the interest rate was stated. Similarly, the annual percentage rate set forth in the Truth in Lending Disclosure Statement provided to the Biggs, consistent with Regulation Z of Title 12 of the Code of Federal Regulations, 12 C.F.R. § 226.17(c), was properly based on the initial interest rate without adjustments.[9]

---

*Treatise on the Law of Contracts,* § 1.2 (4th ed.2007). Moreover, in connection with the 2006 Countrywide loan, Jeanne Biggs, the sole borrower, signed a document in which she expressly affirmed that no oral representations or promises had been made to her.

8. The following language appears in bold-face and in all capital letters at the top of the 2006 Adjustable Rate Note:

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.

THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

9. The disclosures for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the disclosures only on the initial rate and should not assume that this rate will increase.

12 C.F.R. Pt. 226, Supp. I.17(c)(1)(8) (rev. Jan.2007)

In sum, viewing the matter through the lens of summary judgment, the Biggs have not raised a genuine issue of material fact that they relied to their detriment on any representation on the part of Countrywide—whatever problems of understanding other borrowers may have with payment option ARMs.

Countrywide's Motion for Summary Judgment as to Count I is **GRANTED** and the Biggs' Cross–Motion as to this Count is **DENIED.**

## IV.

■ In Count II, the Biggs allege that Countrywide took possession of funds belonging to them and converted those funds to its own use by disbursing monies from the Biggs' mortgage loans to itself and other parties.

While the Biggs seek monetary damages, they are not asking for the return of specific funds that Countrywide has been holding separate and apart. Inasmuch as money in general is not subject to a claim of conversion, this claim fails as a matter of law. See, e.g., *Darcars Motors of Silver Springs, Inc. v. Borzym,* 379 Md. 249, 841 A.2d 828, 834, n. 3 (2004) ("As a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds").

Countrywide's Motion to Dismiss as to Count II is **GRANTED** and the Biggs' Cross–Motion for Summary Judgment as to Count II is **DENIED.**

## V.

■ In Count III, the Biggs allege that Countrywide conspired with others to make money by putting homeowners into payment option ARMS with risky features from which more value could be extracted for the conspirators' own use, as opposed to leaving homeowners in their current mortgages. A civil conspiracy is a combi-nation of two or more persons by agreement or understanding to accomplish an unlawful or tortious act or to use unlawful means to accomplish a lawful act and actual legal damage to the plaintiff. *Lloyd v. General Motors Corp.,* 397 Md. 108, 916 A.2d 257 (2007). Conspiracy, however, is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff. *NRT Mid–Atlantic, Inc. v. Innovative Props., Inc.,* 144 Md.App. 263, 797 A.2d 824, 838 (Md.2002).

Because, as will be seen hereinafter, no separate claim of tort survives Countrywide's motion, the claim of conspiracy is subject to dismissal.

Accordingly, Countrywide's Motion to Dismiss Count III is **GRANTED.**

## VI.

■ In Count IV, the Biggs assert a common law claim in fraud, viz. that Countrywide made fraudulent representations in connection with their loan transactions which the Biggs reasonably relied upon to their detriment.

As with their RICO claim, the Biggs submit that, in providing the 2004 ARM and 2006 ARM papers to them to execute, Countrywide in effect made representations that the 2004 ARM and 2006 ARMs were appropriate for senior citizens of modest means on a fixed pension, which representation was false. They also assert that the conduct and omissions of Eaglewood and its employees Sweeney and Crowe are attributable to Countrywide because Countrywide held out Eaglewood in writing as its partner.

Reprising its response to the RICO claim, Countrywide argues that it had no duty to place the Biggs in a loan most "suitable" to their age and financial condition. A lender, says Countrywide, makes

no representations of "appropriateness" by agreeing to extend a loan to a borrower. Moreover, even if presentation of loan documents by Countrywide could be construed as a representation, that sort of representation cannot form the basis of fraud in Maryland as a matter of law. *See Alleco v. Weinberg Found. Inc.*, 665 A.2d 1038, 1048–49 (Md.1995) ("Acceptance of the plaintiffs' 'implied misrepresentation' theory would extend the scope of a tort action for fraud or deceit beyond that recognized in our cases or, to the best of our knowledge, in cases elsewhere."). Finally, even if the Biggs could prove that Countrywide made a misrepresentation of material fact to them with respect to the 2006 loan, says Countrywide, they cannot prove reasonable reliance. Whereas the Biggs may not have understood the nuances of a pay option ARM prior to 2004, they gained that knowledge by entering into the 2004 loan agreement and by receiving the monthly mortgage statements reflecting the adjustable rates. The Biggs cannot, therefore, claim the same level of ignorance when they again entered into a second payment option ARM in 2006.

The Court agrees that the Biggs have failed to state a cause of action in fraud for the same reason they have failed to state a RICO claim. As a matter of irrefutable fact, they are unable to show that they reasonably relied on anything Countrywide or its supposed confederates might have said.

Countrywide's Motion to Dismiss Count IV is **GRANTED.**

### VII.

■ In Count V, the Biggs claim that Countrywide made unspecified negligent misrepresentations that are actionable. Countryside says for the same reasons that the Biggs' fraud claim fails, their negligent misrepresentation claim also fails, citing *Cooper v. Berkshire Life Ins. Co.*,

148 Md.App. 41, 810 A.2d 1045 (2002) (identifying reasonable reliance and incurring of damages caused by such as two elements of negligent misrepresentation). The Court agrees.

■ To recover damages for negligent misrepresentation, the plaintiff must prove that:

1) the defendant, owing the plaintiff a duty of care, negligently misrepresented a material fact;

2) the defendant intended that the plaintiff would act in reliance upon the misrepresentation;

3) the defendant knew the plaintiff probably would rely on the misrepresentation, which if false would cause damages to the plaintiff;

4) the plaintiff justifiably acted in reliance on the misrepresentation; and

5) the plaintiff suffered damages as a result of the reliance on the misrepresentation.

*Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 916 A.2d 257, 273 (2007).

The Court finds that the same deficiency that characterizes the Biggs' claims for RICO violations and for fraudulent misrepresentation exists as to the negligent misrepresentation claim. They cannot be heard to say that they relied on any such representations.

Countrywide's Motion to Dismiss Count V is **GRANTED.**

### VIII.

■ In Count VI, the Biggs assert that Countrywide owed them a duty of care in processing their mortgage loan application and that Countrywide breached that duty, by putting them into a payment option ARM, the high risk features of which were not suitable for borrowers of their age and station. The Biggs rely primarily on

*Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 515 A.2d 756, 762 (1986) ("[I]mplicit in the undertaking of the Bank to process the loan application is the agreement to do so with reasonable care.").

Countrywide finds *Jacques* to be inapposite; it does not, says Countrywide, establish the duty claimed by the Biggs. In *Jacques*, the bank refused to lend the full amount of the loan requested by the borrower under terms it had agreed to in the loan application, despite the fact that the bank knew that the borrower would be forced to proceed to settlement on his underlying purchase contract, regardless of how much money the bank agreed to lend. *Id.* at 529–30, 515 A.2d 756. *See also Silver Hill Station Ltd. P'ship v. HSA/Wexford Bancgroup, LLC*, 158 F.Supp.2d 631, 640 (D.Md.2001) (limiting Jacques and holding that "[t]he Court therefore agrees with Judges Ramsey and Smalkin that a lender in Maryland owes no duty in tort to reasonably process a loan, absent extraordinary risk or particular vulnerability or dependency on the part of the borrower."). Here Countrywide provided the full amount requested by the Biggs under the precise terms agreed to by them.

The Court agrees that *Jacques* provides no support for the Biggs' claim under the circumstances of this case. No authority stands for the proposition that banks owe a duty to elderly borrowers to place them in a more "suitable" loan, even while the borrowers are actively seeking and ultimately agree to some other, more burdensome loan. There is, to be sure, the possibility that mental impairment on the part of a contracting party, might permit the disavowal of a contract. That is a well-established part of the law. *See* Restatement (Second) Contracts, § 15 (1981). Presumably, insofar as specific elderly mortgagors might suffer from such mental limitations, it is arguable that they may be able to state a cause of action against an overreaching mortgagee, the precise parameters of which—particularly as to remedy—will have to await the development of a specific record in a given case. Here, however, there is no indication that the Biggs were suffering from mental disabilities that impaired their ability to enter into a loan contract. Quite the contrary, as the Court has noted; they were active, knowledgeable shoppers and beneficiaries of multiple mortgages, including ARMs. They were not placed into a loan transaction or transactions they could not understand. They were in a fixed rate mortgage with another lender in between the two Countrywide ARMs they now complain of and could have stayed with that loan or sought another fixed rate loan instead of a second ARM. From all that appears, the Biggs actively sought the low teaser rate of the second Countrywide ARM. Given their prior experience with ARMs, they could hardly claim surprise when the rate quickly ratcheted up according to the terms of the loan. And whatever other payment options the second ARM offered, the Biggs clearly had the option of paying off the loan at the conventional 30 year full amortizable rate, with a cap on the interest rate of 9.95%. It may be that they were unable to afford those payments. But that is not something for which Countrywide can be faulted.

Countrywide's Motion to Dismiss Count VI is **GRANTED**.

### IX.

A separate Order will be **ENTERED** implementing this decision.

### *ORDER*

Upon consideration of Defendant Countrywide's Motion to Dismiss, or, in the Alternative, for Summary Judgment [Paper No. 45] and Plaintiffs Biggs'

[Cross-]Motions for Summary Judgment as to Counts I and II of the Amended Complaint [Paper Nos. 77 and 95], it is for the reasons set forth in the accompanying Opinion this 17th day of September, 2008

**ORDERED:**

1) Countrywide's Motion for Summary Judgment as to Count I [Paper No. 45–2] is **GRANTED;**

2) Plaintiffs' [Cross-]Motion for Summary Judgment as to Count I [Paper No. 77] is **DENIED;**

3) Countrywide's Motion to Dismiss as to Count II [Paper No. 45–1] is **GRANTED;**

4) Plaintiffs' Cross–Motion for Summary Judgment as to Count II [Paper No. 95] is **DENIED;**

5) Countrywide's Motion to Dismiss as to Count III, IV, V and VI [Paper No. 45–1] is **GRANTED;**

6) Count VII of the Amended Complaint is **DISMISSED** by the Court *sua sponte;*

7) Countrywide's Motion to Dismiss or in the Alternative, for Summary Judgment, insofar as not otherwise addressed herein, is **MOOT;** and

8) Eaglewood Mortgage LLC, not having filed a dispositive Motion, remains in the case as of now.